**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240346-U

Order filed October 27, 2025

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| JAMES NADOLSKI, | ) | Du Page County, Illinois, |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-24-0346 |
| and | ) | Circuit No. 15-D-1351 |
| | ) | |
| TERESA NADOLSKI, | ) | Honorable |
| | ) | James F. McCluskey, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE BERTANI delivered the judgment of the court.
Presiding Justice Brennan and Justice Holdridge concurred in the judgment.

**ORDER**

¶ 1    *Held*:  A subsequent agreed order establishing petitioner's maintenance obligation to respondent did not negate provisions within the parties' marital settlement agreement that required the immediate recalculation of petitioner's obligation following an increase in his income. The circuit court did not err in holding petitioner in indirect civil contempt and ordering him to pay arrearages for his failure to recalculate and pay maintenance in violation of the marital settlement agreement. Affirmed.

¶ 2    Petitioner, James Nadolski, appeals from post-dissolution proceedings in which the circuit

court of Du Page County found him in indirect civil contempt for failure to increase his spousal

maintenance pursuant to the marital settlement agreement (MSA) entered into with respondent, Teresa Nadolski, and determined that he owed $90,216 in arrearages. On appeal, James contends that the entry of a subsequent agreed order negated the arrangement in the MSA that required him to immediately increase his maintenance obligation upon an increase in his income. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The parties were married on July 15, 1994, and three children were born to the marriage. The court entered a judgment for dissolution of marriage on October 5, 2016, which incorporated their MSA and ended their 22-year marriage.

¶ 5        Article III of the MSA addressed maintenance. While it did not establish an immediate maintenance award, paragraph two reserved Teresa's right to maintenance based upon the parties' current incomes. James was self-employed earning an anticipated $96,000 gross annual salary at the time of entry, and Teresa, a high school recruiter, earned $65,468 per year. Article III, paragraph three stated that Teresa's reservation of her right to maintenance

> "shall continue until such time as a change in circumstances occurs. If either party
> has an increase in income of the base rates (JN $96k or TN $65) during any year
> (or any increase in any base rates after any base rate adjustments), the party with
> the increase must immediately notify the other party. Further the parties agree to
> immediately recalculate and pay the maintenance due the Wife after any such base
> rate increase using the State of Illinois 1/1/15 maintenance formula."

¶ 6        Paragraph three went on to describe the agreed maintenance formula:

> "Specifically the amount of maintenance shall be calculated by taking 30%
> of the payer's gross income minus 20% or [*sic*] the payee's gross income. The

2

amount calculated as maintenance, however, when added to the gross income of the payee, may not result in a payee receiving an amount that is in excess of 40% of the combined gross income of the parties. Lastly any decrease in income of the base rates will be recalculated as of 12/31 for each year."

Article III concluded that Teresa's right to maintenance was permanent absent the death of either party, her remarriage, or her cohabitation with another.

¶ 7 Article V of the MSA addressed James's child support obligation. Paragraph three thereof required the parties to exchange, *inter alia*, their tax returns and W-2 forms "at the time of filing but no later than April 15th of each year."

¶ 8 On June 21, 2018, Teresa filed a petition for rule to show cause against James for his alleged failure to comply with the MSA. She asserted he was delinquent in educational expenses for the parties' children, did not timely tender his 2016 tax returns, and failed to timely notify her of increases in income as reflected in the returns.

¶ 9 James filed a petition to modify maintenance on August 27, 2018, pursuant to the Illinois Marriage and Dissolution of Marriage Act (Act). 750 ILCS 5/504, 510 (West 2022). The petition alleged a substantial change in circumstances based on his change in employment status as a salaried employee and an increase in his and Teresa's incomes. He sought a modification of his maintenance obligation and requested a $128,000 cap for calculating his income to determine that obligation.

¶ 10 The circuit court subsequently entered two agreed orders. The first, entered on September 18, 2018, ordered James to pay Teresa $20,000 in resolution of her petition for rule to show cause. The second, entered on November 20, 2018 (agreed order), addressed James's petition to modify maintenance. It stated "[p]ursuant to Article III, paragraph 2 of the parties' " MSA and consistent

3

with guideline maintenance, James's maintenance obligation was set at $1931 per month based on his $162,700 annual income and Teresa's $69,852 annual income.

¶ 11    Like the MSA, the agreed order set deadlines for the notification of income increases and exchange of financial documents. Specifically, it required the parties to provide evidence of an income increase to the other within 7 days after going into effect and directed the exchange of tax returns and W-2 forms within 14 days of filing, "but no later than May 1st of each year." It also provided that James's maintenance obligation and Teresa's right to maintenance "shall be subject to modification with respect to the amount payable pursuant to" section 510 of the Act. *Id.* § 510.

¶ 12    On May 24, 2023, Teresa filed a three-count petition for adjudication of indirect civil contempt and for other relief, or in the alternative, a motion to modify support. Teresa sought a rule to show cause why the court should not hold James in indirect civil contempt for his failure to comply with the MSA's maintenance requirements. She alleged that he failed his obligation to notify her of any increase in his base income and timely tender his financial documents. According to the petition, between 2019 and 2022, Teresa was made aware of James's income increases only after he exchanged his financial documents. James rebuffed Teresa's attempts to adjust his maintenance obligation in accordance with the MSA. Accordingly, the petition incorporated calculations pursuant to article III, paragraph 3 of the MSA asserting James was $90,216 in arrears. In an alternative count, Teresa moved to modify support and asserted James's increase in income was a substantial change in circumstances calling for the recalculation of his maintenance obligation.

¶ 13    The crux of the parties' disagreement pertained to their interpretation of the effect the agreed order had on the MSA. According to Teresa's petition, the order did not alter or negate the MSA's provisions relating to the immediate modification of support. In contrast, James averred

4

that the agreed order absolved his affirmative obligation to modify his maintenance payments as his income increased. Teresa later petitioned to modify James's contribution to their youngest child's post-secondary education expenses based on James's increased income.

¶ 14    The circuit court conducted a hearing on Teresa's petitions on November 14, 2023. James testified that he was employed as the director of engineering development at Command Alkon with a base salary of $205,000. He received a $26,000 bonus that year. As was the case with his salary increases from February 2019 onwards, James could not recall whether he informed Teresa of his 2023 salary increase but stated that he previously informed her of raises verbally and through text communication. He did not introduce any text messages into the record. He did not inform her of his bonus. Teresa testified that James had never informed her of his raises; rather, she learned of his income increases only after receiving his tax returns and financial forms. Her gross income from the preceding year was $67,576. The court directed the parties to submit trial briefs and took the matters under advisement.

¶ 15    The court granted the petition for rule to show cause in a written order on January 16, 2024. It accepted Teresa's interpretation of the interplay between the MSA and the agreed order finding that the agreed order only addressed the parties' base rates of income, and its reference to article III, paragraph two of the MSA did not negate the language in article III, paragraph three. Therefore, it found that the true-up provisions in the original judgment still applied. It issued a rule to show cause against James adopting Teresa's arrears calculation of $90,216.[1]

---

[1] The January 16, 2024, order prematurely set a purge. A finding of civil contempt and resultant purge should not issue unless the court determined James's failure to comply with its order was willful and contumacious. See *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006); see also *People v. Weinstein*, 2024 IL App (2d) 230062, ¶ 107 (stating a court may not summarily punish an alleged contemnor for indirect contempt due to its lack of personal knowledge of the contumacious conduct). The court made that determination in its April 30, 2024, written ruling following a contempt hearing and set a purge in the sum of $30,000.

¶ 16    The court denied the relief sought in her remaining counts as well as her petition to modify post-secondary expenses. The court, in denying her alternative request to modify maintenance, considered the factors set forth in sections 504 and 510 of the Act and found her current earned income, her maintenance award, and the true-up provisions were sufficient to meet her needs and were fair and equitable.

¶ 17    A hearing on the rule was held on March 19, 2024. To explain why he failed to increase his maintenance payments between the years 2019 and 2022, James testified that the true-up language from the MSA "was never agreed upon in the 2018 agreement" and that he operated under the assumption that "there had to be a court ruling" before his obligation would be modified. He stated that the court's January ruling was the first time he was informed by an authority that this interpretation was incorrect. He testified that he "did not believe *** that maintenance would be modified whatsoever unless a motion was filed." He testified that he paid his $1931 monthly maintenance obligation since the entry of the agreed order.

¶ 18    The parties testified to several e-mail exchanges addressing maintenance that were read into the record. Teresa contacted James to recalculate his maintenance owed for 2019 and 2020. James responded in a December 2021 e-mail by stating

> "[w]hat has changed in your finances that you think you need more money? You are getting additional monthly funds from the stimulus plan for [their youngest child], I am paying $1,100 a month for an apartment in Birmingham to keep my job. Some of my 'income' is based on relocation bonus for moving. This is not as cut and dry as you would like it to be."

Addressing the same issue a couple days later, James e-mailed "[c]ould you pass the red-face test and not be embarrassed asking for more money from me because I worked extremely hard these past five years, and my success now works against me, so I am punished twice."

¶ 19    Teresa testified that these were among dozens of e-mails the parties exchanged relating to her request for maintenance recalculation. Each time Teresa proposed a new maintenance amount, James responded that her "math [was] incorrect" and questioned her need for more money. On several occasions, James's e-mails referenced the MSA's calculation formula, deeming Teresa's proposals incorrect because they "exceed[ed] the 40 percent rule." James sent an e-mail in August 2019 in response to Teresa's suggested maintenance recalculation. He claimed she had failed "to take into consideration the 40 percent rule" and offered his own maintenance recalculation, reducing his monthly obligation to $1808, which he characterized as "correct." Teresa testified that for that month she received $1808 in maintenance and since September 2019, has received $1916.

¶ 20    Teresa filed two trial briefs after the hearing and contempt proceeding in which she contended James failed to provide any evidence that he conveyed his raises to her as is required by the parties' agreements and his testimony revealed his violations were willful and contumacious. She identified eight raises and ten bonuses James received since the entry of the agreed order, none of which were appropriately disclosed to her. She contended James's failure to timely inform and recalculate his maintenance obligation arose to contemptuous conduct. Furthermore, his justification for refusing to increase his maintenance obligation—that he believed he was not bound by the MSA's true-up provisions—was belied by his e-mails indicating the contrary.

¶ 21    James's written closing argument maintained that he did not believe the true-up provisions in the MSA applied following the entry of the agreed order. Based on his calculations of certain expenses that were reflected as income on his W-2, he asserted his delinquent maintenance amount was $22,656.

¶ 22    The court's April 30, 2024, written ruling found that the record "was replete with proof that James was aware of the true-up provisions of the MSA" based on the parties' e-mail exchanges. It discounted James's testimony in whole, finding he lacked credibility. It modified James's monthly maintenance obligation to $4160 based upon current statutory guidelines and affirmed he was in arrears on maintenance in the sum of $90,216. It set his purge amount at $30,000.

¶ 23    James appeals.

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, James asserts the circuit court misconstrued the agreed order in holding its terms did not abrogate the true-up provisions in the MSA. He also argues that the court abused its discretion in finding that he violated the MSA and agreed order and finding him in indirect civil contempt. Finally, he challenges the court's maintenance arrears calculation.

¶ 26    We begin our analysis by noting that the appeal turns on language in the MSA which the parties and the circuit court continuously referred to as "true-up provisions." "True-up" is a legal term of art that neither party here offers a certain definition. James's appellate brief cites case law interpreting "true-up" language. See *In re Marriage of Yabush*, 2021 IL App (1st) 201136, ¶¶ 28, 33 (discussing that generally, " 'true-up' language" prevented a finding of a substantial change in circumstances when considering the modification of child support because such language indicated previous contemplation of a change in income). Teresa's appellate brief explains that the

8

expression refers to the language in the MSA that compels the immediate recalculation of maintenance after an increase in the parties' base rate incomes pursuant to the agreed upon maintenance formula.

¶ 27                    A. Construction of Marital Settlement Agreement and Agreed Order

¶ 28        With this in mind, we turn to James's first appellate contention that the terms of the agreed order control his maintenance obligation and extinguished the true-up provisions in the MSA. While James states that the MSA's terms "were no longer consistent based upon the subsequently-agreed order" he fails to identify which specific terms directly conflict with the true-up provisions.

¶ 29        We interpret a marital settlement agreement using contract construction principles. *In re Marriage of Dundas*, 355 Ill. App. 3d 423, 425-26 (2005). The interpretation of a marital settlement agreement is a question of law subject to *de novo* review. *Id.* at 426. As with any other contract, in construing a marital settlement agreement, "the court must ascertain the parties' intent from the language of the agreement." *Blum v. Koster*, 235 Ill. 2d 21, 33 (2009). Agreed orders are also governed by the law of contracts. See *Commonwealth Edison Co. v. Elston Avenue Properties, LLC*, 2017 IL App (1st) 153228, ¶ 13. Accordingly, in construing the order the goal is to ascertain the parties' intention and "when there is no ambiguity in the terms," the parties' intention "must be determined from the language of the [agreed order] alone." *Id.*

¶ 30        To promote amicable settlement, section 502 of the Act permits parties undergoing the dissolution of marriage to enter into an agreement resolving the rights to property, support, and parental responsibility. 750 ILCS 5/502(a) (West 2022). An agreement concerning maintenance may denote it is "non-modifiable in amount, duration, or both." *Id.* § 502(f). Where an agreement does not provide that maintenance is non-modifiable in its "amount, duration, or both, then those terms are modifiable upon a substantial change of circumstances." *Id.* A court is bound by the

9

terms of the agreement unless it finds that the agreement is unconscionable. See *id.* § 502(b). Section 510(a-5) permits the modification of a maintenance order, "only upon a showing of a substantial change in circumstances," and enumerates nine factors, in addition to factors set forth in section 504(a), that a court must consider when reviewing a modification request. 750 ILCS 5/510(a-5) (West 2022).

¶ 31 James takes the position that the agreed order modified the MSA. When a contract incorporates a separate document, we interpret the contract and the incorporated document as a whole. *Wiczer v. Wojciak*, 2015 IL App (1st) 123753, ¶ 36; *Kirschenbaum v. Northwestern University*, 312 Ill. App. 3d 1017, 1029 (1999). When possible, contracts are construed to harmonize different provisions. *Henderson v. Roadway Express*, 308 Ill. App. 3d 546, 549 (1999). However, when a contract modification "is inconsistent with a term of a prior contract between the same parties, the modification is interpreted as including an agreement to rescind the inconsistent term in the prior contract." *Richard W. McCarthy Trust Dated September 2, 2004 v. Illinois Casualty Co.*, 408 Ill. App. 3d 526, 534 (2011). " 'The modified contract is regarded as creating a new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed.' " *Id.* (quoting *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 469 (2004)).

¶ 32 James is correct that the agreed order modified certain provisions of the MSA, most plainly the slight modification of increased income and financial disclosure timelines. It mandated the parties exchange "evidence of any [income] increase *** within seven (7) days of implementation of said increase" versus the MSA's requirement of immediate notice. The exchange of tax and financial documents was directed within "14 days of filing, but not later than May 1st of each year"

10

whereas the MSA required exchange "at the time of filing, but no later than April 15th of each year."

¶ 33    Conversely, the agreed order did not address the MSA's obligation to immediately recalculate maintenance upon an increase in base income. James argues that the agreed order's language that his obligation "shall be subject to modification with respect to the amount payable pursuant to" section 510 of the Act eclipses the maintenance recalculation structure of the MSA. This contention fails on two fronts. First, his reading advocates for an absurd result. *United City of Yorkville v. Fidelity & Deposit Co. of Maryland*, 2019 IL App (2d) 180230, ¶ 89 ("A contract should be construed, if reasonably possible, to avoid an absurd result."). While section 510 of the Act provides several factors that a court will weigh when determining the propriety of a maintenance modification request, it does not provide a formula for doing so. 750 ILCS 510(a-5) (West 2022). Thus, it is unclear how section 510 would strictly govern James's obligation, *i.e.*, the "amount payable," and Teresa's right to receive maintenance as he suggests in his appellate briefs.

¶ 34    Second, his position results in a disharmonious reading of the agreed order and the MSA, when a plain reading of the provisions in each are "easily harmonized." *Henderson*, 308 Ill. App. 3d 546, 549 (1999). Read in its entirety, the plain language of the MSA contemplated recalculation of maintenance after an increase in James's or Teresa's incomes on an ongoing basis. While it was presumed that this was a modifiable arrangement (see 750 ILCS 5/502(f) (West 2022)), the agreed order explicitly provides that James's maintenance obligation and Teresa's right to maintenance remained modifiable under section 510 of the Act. There is no ambiguity between these two provisions, despite James's assertion to the contrary.

¶ 35    We acknowledge James's contention that rules of contract construction provide that where a modification "is inconsistent with a term in a prior contract," it must be interpreted as a recission

11

of the inconsistent term in the original agreement. *McCarthy Trust*, 408 Ill. App. 3d at 534. He has not, however, identified how the agreed order is inconsistent with his obligation to immediately recalculate maintenance upon his base income increase. We also consider the maxim that a strong presumption exists against interpreting a contract to include a term that could have been easily included but was not. *Peterson v. Residential Alternatives of Illinois, Inc.*, 402 Ill. App. 3d 240, 245 (2010). The parties here could have specifically abrogated the true-up requirements of the MSA but did not.

¶ 36                              B. Indirect Civil Contempt Finding

¶ 37        James next argues that he did not willfully and contumaciously violate or disobey a court order and the indirect civil contempt finding against him should be vacated. He also contests the court's finding that he was not a credible witness.

¶ 38        Civil contempt is coercive and used to compel compliance with court order. *People v. Weinstein*, 2024 IL App (2d) 230062, ¶ 105; *In re Marriage of Weddigen*, 2015 IL App (4th) 150044, ¶ 20. An individual has committed civil contempt where he or she failed " 'to do an act ordered by the court for the benefit of another party.' " *Weddigen*, 2015 IL App (4th) 150044, ¶ 20 (quoting *In re Marriage of Miller*, 88 Ill. App. 3d 370, 373 (1980)). Indirect civil contempt consists of noncompliant conduct occurring outside of the judge's presence. See *Weinstein*, 2024 IL App (2d) 230062, ¶ 106. "A finding of indirect civil contempt relies on the existence of a court order and willful disobedience of that court order." *Sinkus v. BTE Consulting*, 2017 IL App (1st) 152135, ¶ 29.

¶ 39        To establish indirect civil contempt, the initial burden rests with the petitioner to prove by a preponderance of the evidence that the alleged contemnor has violated a court order. *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). Failure to comply with a court order is

*prima facie* evidence of contempt. *Country Mutual Insurance Co. v. Hilltop View, LLC*, 2014 IL App (4th) 140007, ¶ 26. Once the petitioner satisfies his or her burden, the burden shifts to the alleged contemnor to show that the violation was not willful or contumacious and he or she had a valid excuse for failing to follow the order. *Charous*, 368 Ill. App. 3d at 107-08. A contemnor behaves contumaciously where his or her "conduct [is] calculated to embarrass, hinder, or obstruct a court in its administration of justice or [it] lessen[s] the authority and dignity of the court." (Internal quotation marks omitted.) *In re Marriage of Knoll & Coyne*, 2016 IL App (1st) 152494, ¶ 50 (quoting *Charous*, 368 Ill. App. 3d at 108).

¶ 40    Whether a party is guilty of contempt is a question of fact left to the circuit court's determination. *In re Estate of Lee*, 2017 IL App (3d) 150651, ¶ 38. We will not disturb this determination unless it is against the manifest weight of the evidence or the record indicates an abuse of discretion. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 22. A court abuses its discretion only when its "decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 41    Further, a circuit court is in a superior position to evaluate a witness's credibility. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 50. It is not our function to set aside a circuit court's credibility determination because a different conclusion is possible based on the evidence. See *id.* ¶ 51.

¶ 42    The MSA and agreed order setting James's maintenance obligations are clear and concise despite James's claim that they were not. Teresa established that James violated both the MSA and

13

agreed order by failing to timely tender his financial information. Further, the e-mail exchanges and James's recalculation of his obligation noted above demonstrate that he understood there was a directive in place to recalculate his maintenance obligation. This established a *prima facie* case of James's indirect civil contempt, shifting the burden to him to prove that the violation was not willful and contumacious and that he had a valid excuse for his violation. See *In re Marriage of Spangler & DeFauw*, 2025 IL App (2d) 240303, ¶ 27. While James purportedly disagreed that the MSA's true-up provisions survived the agreed order, he failed to justify his noncompliance with other elements of the parties' subsequent agreement. Namely, the record indicates that James did not notify Teresa of any income increases or timely tender his tax returns and financial documents.[2] The agreed order required the exchange of certain tax documents within 14 days of filing or, at the latest, by May 1. The evidence herein clearly establishes that James violated the disclosure requirements of the agreed order. He did not provide his 2020 tax returns until September 13, 2021, and did not tender his 2019 and 2020 W-2 forms until August 11, 2020, and September 20, 2021, respectively. His offered excuses for failing to follow the court's order—that he (1) was bound by the $1931 monthly maintenance identified in the agreed order and (2) not bound by the MSA's true-up provisions—have no bearing on his failure to comply with the order's disclosure requirements.

¶ 43        Additionally, the record undermines the notion that his purported valid excuse was a sincerely held belief. His caustic e-mail exchanges directed at Teresa asserted that her calculations of his increased maintenance obligation violated the "40 percent rule" thereby explicitly referring

---

[2]There is a lack of evidence in the appellate record. We do not have the financial documents or e-mails admitted into evidence at trial. Furthermore, while James testified that at times he informed Teresa of his raises via text message, he did not introduce any exhibits to substantiate that testimony.

to the true-up calculation in the MSA. Moreover, James employed this formula to calculate a downward change in his maintenance obligation as evidenced by his e-mail responses. Teresa testified that James then began to send her a lower monthly maintenance amount than was agreed to in the agreed order.

¶ 44 James contends in his reply brief that the court erred in relying on this testimony because beyond a "one-time aberra[nt]" lower maintenance payment, "all other monthly payments of $1931 *were* made." This contention is unsound. Neither party introduced document evidence to corroborate their testimony regarding the maintenance amounts paid or received. James directs us to his equivocating testimony to demonstrate he resumed making payments as required by the agreed order: "I believe I have, yes. I set up the payments in 2018, whenever that was." The parties merely offered contradictory testimony on the issue, and the circuit court was in a superior position to weigh this testimony and evaluate the credibility of James and Teresa. See *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 29 (1993).

¶ 45 More importantly, the e-mails were not introduced to prove that James violated the parties' maintenance agreements by failing to pay his ordered obligation. Rather, they served to impeach his stated excuse for noncompliance. His statement to Teresa that "[y]ou need to take into consideration the 40 percent rule" and his engagement with the true-up formula to conduct his own calculation contradicts his testimony that he operated under the belief that the agreed order relieved him of the obligation to recalculate maintenance as his income increased. This evidence supports the circuit court's finding that James was not credible. This conclusion is reinforced by the fact that the record is devoid of evidence that James ever advised Teresa of his belief that the agreed order disposed of the true-up provisions.

15

¶ 46　　　　James has made no argument, offered no evidence, and provided no testimony that he was unable to comply with the order's requirements and pay his maintenance obligation. Each piece of evidence presented lent credence to Teresa's position that James willfully and contumaciously disregarded his maintenance obligation. His failure to timely tender his financial documents pursuant to the agreed order is not disputed. His inability to recollect whether he had notified Teresa of *any* income increase since 2018 did not rebut her allegations. Separate from these violations, his stated excuse for noncompliance was rebutted by the parties' e-mail communications. The court did not err in holding James in contempt.

¶ 47　　　　　　　　　　　　　　　C. Arrearage Calculation

¶ 48　　　　James states that the circuit court erred by adopting Teresa's calculations of his arrears in maintenance. Maintenance awards are within the discretion of a circuit court and will not be disturbed absent an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). Following the contempt proceedings, the circuit court examined the calculations posited by each party and concluded that Teresa's calculations were correct. Moreover, the court recognized the admission that no tax documents were presented to support James's testimony that his income as stated on his W-2s included expense reimbursements. We further note the credibility observations of the court.

¶ 49　　　　Based on our holding that the immediate recalculation of maintenance required by the MSA was not negated by the agreed order, we hold that the circuit court did not abuse its discretion in adopting Teresa's calculations made pursuant to the MSA formula for the relevant years in which James failed to increase his maintenance obligation.

¶ 50　　　　　　　　　　　　　　　III. CONCLUSION

¶ 51　　　　The judgment of the circuit court of Du Page County is affirmed.

¶ 52         Affirmed.